**James N. ROSS, Appellant,**

v.

**Edward J. DERWINSKI, Secretary of Veterans Affairs, Appellee.**

No. 90–1495.

United States Court of Veterans Appeals.

Submitted June 25, 1992.

Decided Aug. 20, 1992.

James N. Ross, pro se.

James A. Endicott, Jr., Gen. Counsel, David T. Landers, Asst. Gen. Counsel, Pamela L. Wood, Deputy Asst. Gen. Counsel, and Craig M. Kabatchnick were on the pleadings, for appellee.

Before NEBEKER, Chief Judge, and MANKIN and IVERS, Associate Judges.

IVERS, Associate Judge:

James N. Ross appeals from an October 5, 1990, Board of Veterans' Appeals (BVA or Board) decision which denied him benefits under the provisions of 38 U.S.C. § 1151 (formerly § 351) for additional disability for blindness of the left eye due to surgical treatment for a detached retina at a Department of Veterans Affairs (formerly Veterans' Administration) (VA) Medical Center (VAMC). The Secretary of Veterans Affairs (Secretary) moves for summary affirmance. Because we hold that the vet-

eran's claim was not well-grounded as required by 38 U.S.C. § 5107(a) (formerly § 3007(a)), we affirm the decision of the BVA.

## FACTUAL BACKGROUND

The veteran served in the United States Army from March 1943 to January 1945. R. at 1. On March 31, 1989, the veteran saw Dr. Susan Johnson for retinal detachment of the left eye. R. at 15. Because he was a veteran, she referred him to a VAMC in St. Louis for treatment. *Id.* The veteran entered the VAMC in St. Louis on April 2, 1989, and was discharged on April 8, 1989. R. at 29. The VAMC discharge summary, completed by Dr. Lawrence Halperin, states in pertinent part as follows:

> Three weeks ago, he noticed floaters in the left eye *and ten days ago, he [experienced an] acute decrease in vision in the left eye and has had that ever since.* He saw Dr. Susan Johnson who diagnos[ed] retinal detachment o[cular] s[inister] [left eye] with macula off *and he was unable to get to the VA Hospital until the day of admission.*

R. at 29 (emphasis added). Dr. Halperin also provided a detailed report of the veteran's condition and the surgical procedure that was performed on his left eye during his stay at the VAMC. He noted that "[t]he risks and benefits of scleral buckle procedure were explained to the patient[,] and on 4–4–89, the patient underwent scleral buckle procedure of the left eye without complication" and that on April 8, 1989, the veteran "was discharged with the vision of count fingers in the left eye." R. at 29–30. In addition, the doctor noted that the veteran would be "followed up on 4–17–89 in the Retina Clinic. He will wear glasses or a Fox shield in front of the left eye and do no heavy straining or lifting." R. at 30.

On September 18, 1989, the veteran informed the VA, inter alia, that he "want[ed] to file a [t]ort [c]laim against the VA for the lose [sic] of my left eye at [the] VA medical facility in St. Louis do [sic] to improper treatment and unprofessional behavior on the part of the doctors at that facility." R. at 8. He requested a "suitable settlement," such as a 100% service-connected disability rating, and stated that if he were not granted such a settlement, he "[would] have to file a malpractice suit against the VA and the doctors who did this operation that blinded me in my left eye." R. at 8–9. On October 6, 1989, the VA received an application for compensation or pension from the veteran in which he stated that "I now have lost 80% vision. I feel I should be compensated for this loss." R. at 11–14. Accompanying his application was a one-page copy of medical notes dated September 28, 1989, from a private physician who noted the veteran's visit with Dr. Johnson, the private physician whom he had seen on March 31, 1989, and who had recommended him for treatment to the VAMC in St. Louis. R. at 15. The medical notes also stated that *"[Four] days [after his visit to Dr. Johnson he] had surgery on [his left eye and] never regained his vision." Id.* Also on October 6, 1989, the VA received a letter from the veteran in which he again stated his intention to file a tort claim against the VA. R. at 17–19. In this letter, the veteran claimed that the doctors who performed the surgery on his left eye "used unsteriled [sic] equipment to treat my eye just one day after the operation was perform [sic]." R. at 17.

On November 2, 1989, the VA Regional Office (RO) issued a deferred rating decision on the veteran's claim, which the RO construed as a claim for service connection under 38 U.S.C. § 1151, and ordered that records of the veteran's April 1989 surgery and subsequent treatment be sent from the St. Louis VAMC. R. at 20. On November 6, 1989, the VARO received another application for compensation or pension from the veteran for "damages rec[eive]d to my eye at [VAMC, St. Louis]." R. at 21–24. That same month, the VARO received a letter from the veteran in which he stated, inter alia, that "I was refused treatment of this eye three time [sic] at [the St. Louis] VA medical center after paying someone $65.00 dollars [sic] to drive me over there." R. at 25. The veteran also stated that he felt the VA had had enough time to take

care of his claim, stated his intention to file a malpractice suit against the VA "for refusing me medical treatment" and demanded that the VA settle the case as soon as possible. R. at 25. An undated letter from the veteran's representative to the VA requests that the VA furnish the veteran with all medical, surgical, clinical, and nurse's records pertinent to development of a claim for service connection under § 1151 and that an investigation of the "surgical incident" be conducted and a report sent to the veteran. R. at 27.

On November 20, 1989, the VARO received the medical records from the St. Louis VAMC which included the discharge summary of Dr. Halperin (R. at 28–31), and a Status Change form on which it was noted that the "[v]eteran has had no outpatient treatment since 4/89 admission." R. at 28. On November 27, 1989, the VARO received another letter from the veteran expressing his dissatisfaction with the amount of time it was taking the VA to process his claim and again stating that he was refused treatment at the St. Louis VAMC three times "after paying someone $195.00 for the three times I had to come to St. Louis." R. at 33–34. On the same day, the RO rating board again deferred a decision on the veteran's claim, pending a reply from the St. Louis VAMC. R. at 35.

In a VA memorandum dated November 30, 1989, Robert F. Munsch, M.D., Chief, Opthalmology Section, reported to the Acting Chief, Surgical Service, about Mr. Ross' surgery and treatment at the St. Louis VAMC in April 1989. This memorandum states in pertinent part the following:

Mr. Ross presented to the VA Hospital on April 2, 1989, and was evaluated by Dr. Larry Halperin. He gave a history of having had the onset of "floaters" in his left eye approximately three weeks prior, and then ten days prior, experienced a marked decrease of vision in his left eye, *at which time* he went to see a Dr. Susan Johnson who diagnosed a retinal detachment involving the macula in the left eye. Dr. Halperin's exam confirmed that diagnosis and the patient was admitted. He was informed that since his retinal detachment was long-

standing and had not been addressed immediately upon its diagnosis, that the prognosis for obtaining good vision postoperatively was very, very poor. All the risks and benefits of retinal detachment surgery were explained and the patient chose to attempt surgical repair.... The surgical procedure was anatomically and technically completely successful.

....

... The patient was discharged with clear instructions for use of his topical eye medication as well as his systemic medications and given an appointment for follow-up on April 17, 1989, in the Retina Clinic. According to the chart, he did not show up for that appointment and to my knowledge, has not been seen nor made an attempt to be seen at this clinic since discharge.

In summary, I believe that he received prompt, competent, and professional management of his problem. His poor visual results cannot be related to any deficiency in his care but rather relate to the nature of his disease upon admission, and most importantly, the fact that *he did not seek surgical care in a timely fashion after the correct diagnosis was made* by a doctor outside the hospital.

R. at 36 (emphasis added).

On March 15, 1990, the RO issued a rating decision denying service connection for blindness of the left eye pursuant to 38 U.S.C. § 351 (now § 1151). R. at 37–38. In so doing, the rating board stated that "the veteran had received prompt, competent and professional care and that the poor visual results were not related to his treatment, but to *his failure to seek care in a timely fashion after his condition had been diagnosed.*" R. at 38 (emphasis added). The rating board also stated that service connection "is denied ... because there is not evidence of carelessness, negligence, lack of proper skill, error in judgment or similar instance of indicated fault on the part of the VA." *Id.* On March 26, 1990, the veteran sent a Notice of Disagreement to the VA in which he again stated that "I was at that medical facility three times for medical treatment and I

was refused and I do have witnesses who will testify on my behalf because I had to pay them for taking me over there for my treatment." R. at 39.

On May 17, 1990, the veteran wrote another letter to the VA stating that "refusal of proper medical treatment is enough evidence to prove neglect and carelessness in this case." R. at 42. The veteran also requested a personal hearing before the BVA. *Id.* On May 28, 1990, the VA furnished Mr. Ross with a Statement of the Case, which stated as the reason for the decision denying the veteran service connection for blindness under 38 U.S.C. § 351 (now § 1151) that there was "no evidence of carelessness, negligence, lack of proper skill, error in judgment, or similar instance of indicated fault on the part of the [VA]." R. at 50. On June 2, 1990, Mr. Ross appealed to the BVA. R. at 51–52. On VA Form 1–9, the veteran contended for the first time that he was awake during his eye surgery and experienced agonizing pain during the operation; he stated that he tried to alert the doctors but that they "would not pay any attention to me." *Id.* The veteran also repeated his claim about the VA's refusal of proper medical care, but this time he stated that the refusal occurred *"after I was discharged* from the VA medical center...." R. at 52 (emphasis added).

On October 5, 1990, the BVA upheld the RO denial of service-connected benefits under 38 U.S.C. § 351 (now § 1151). The veteran perfected a timely appeal to this Court. The Court has jurisdiction of the case under 38 U.S.C. § 7252(a) (formerly § 4052(a)).

## ANALYSIS

The controlling statute, 38 U.S.C. § 5107(a) (formerly § 3007(a)), provides in pertinent part as follows:

... a person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting *evidence sufficient to justify a belief* by a fair and impartial individual that the claim is well-grounded.

(Emphasis added.) Since the statute does not define the term "well-grounded claim," we have sought to do so in several cases. A well-grounded claim is "a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of § [5107(a)]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). "[T]he submission of a facially valid claim is necessary; inherently incredible allegations of injury would obviously not suffice." *Gilbert v. Derwinski,* 1 Vet.App. 49, 55 (1990). "Although the claim need not be conclusive, the statute provides that it must be accompanied by *evidence." Tirpak v. Derwinski,* 2 Vet.App. 609, 610–11 (U.S.Vet.App.1992) (emphasis in original).

In this case, the appellant contends that his loss of vision in the left eye is the result of surgery performed on his left eye to correct a detached retina in April 1989 at a VAMC in St. Louis. This is far from an "inherently incredible allegation"—i.e., it is entirely conceivable that surgery to an eye could result in a loss of vision in that eye. However, the veteran's claim was not accompanied by any supporting evidence and therefore falls short of the statutory requirement for a well-grounded claim.

The veteran contends, in his arguments before this Court, that the BVA erred when it found as fact that ten days elapsed between the time that a private physician diagnosed his detached retina and the time he sought treatment. *See* Appellant's Response to Secretary's Motion for Summary Affirmance at 1–2. Although there is evidence in the record to support this claim, this evidence shows at best that the veteran's loss of vision may not have resulted from delay between the time of diagnosis and the time the veteran sought treatment; however, given the concerns of the ophthalmologists regarding the ill effects of delay in the treatment of retinal detachment, the evidence would do little to disturb the plausible basis in the record for the general finding of the BVA that the veteran's loss of vision was caused in part by the time that elapsed between the onset of symptoms of the condition ("having had ... 'floaters' in his left eye approximately

three weeks prior [to admission], and then ten days prior, [having] experienced a marked decrease in vision in his left eye" (R. at 5)) and treatment for it. *James N. Ross*, BVA 90–33723, at 4 (Oct. 5, 1990); *see Culver v. Derwinski*, 3 Vet.App. 292, 299 (1992); *Collins v. Derwinski*, 2 Vet. App. 215, 217 (1992); *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990). Moreover, the evidence of a technical error in the calculation of the number of days that elapsed between the time of diagnosis and the time of admission to the VA hospital does not support the veteran's claim that his loss of vision did result from the surgery performed on his left eye by VA doctors. Thus, even if the BVA finding regarding the number of days between diagnosis and admission were clearly erroneous, any such error would not be prejudicial to the resolution of the claim. *See* 38 U.S.C. § 7261(b) (formerly § 4061(b)); *Thompson v. Derwinski*, 1 Vet.App. 251, 254 (1991).

In addition, the veteran claimed several times in letters to the VA that were before the BVA and are in the record on appeal that he sought treatment several times at the VAMC and was refused. R. at 25, 33–34, 39, 51. There is no evidence in the record to support this claim, although there is evidence in the record that the veteran failed to appear for a scheduled follow-up visit to the VA Retina Clinic after his surgery, and that the alleged refusals to treat him occurred after the surgery in question. R. at 36, 52. The veteran claims that he paid individuals to drive him to the VAMC on three occasions when he was refused treatment. R. at 25, 33–34, 39, 51. However, he provides no testimony or written statements from these witnesses.

The unsupported claims on the part of the veteran that the loss of his vision was the result of surgery performed by VA doctors do not "justify a belief by a fair and impartial individual that the claim is well-grounded" (38 U.S.C. § 5107(a)), especially in light of medical evidence in the record which does support the BVA's findings that the veteran's loss of vision was due to the extent of retinal detachment and damage to the macula as well as to the veteran's delay in seeking treatment after the onset of symptoms of the eye condition. Because the claim was not well-grounded under § 5107, the VA was not required to adjudicate it and any error in the subsequent administrative proceedings is therefore harmless. *Sanchez v. Derwinski*, 2 Vet.App. 330, 333 (1992); *Kehoskie v. Derwinski*, 2 Vet.App. 31, 34 (1991); *Tirpak*, at 610–11.

CONCLUSION

Accordingly, the Secretary's motion for summary affirmance is GRANTED, and the decision of the Board is AFFIRMED for the above reason; no view is expressed as to the Board's decision on the merits.